UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MIGUEL ANTONIO LOPEZ-CACEREZ,<br><br>           Petitioner,<br><br>v.<br><br>KEVIN McALEENAN, et al.,<br><br>           Respondents. | Case No.: 19-cv-1952-AJB-AGS<br><br>**ORDER:**<br><br>**(1) GRANTING IN PART AND DENYING IN PART PETITION FOR WRIT OF HABEAS CORPUS (Doc. No. 1); AND**<br><br>**(2) GRANTING PETITIONER'S MOTION FOR ORDER ON WRITTEN SUBMISSIONS (Doc. No. 16)** |

Petitioner Miguel Antonio Lopez-Cacerez ("Petitioner") appears before the Court on a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241 ("the Petition"). (Doc. No. 1.) Also before the Court is Petitioner's motion for order on written submissions or to set an evidentiary hearing. (Doc. No. 16.) Petitioner has been detained by Immigration and Customs Enforcement ("ICE") since approximately March 2019. (*Id.* at 5.) Petitioner contends his detention has exceeded the statutory limits and seeks release under appropriate conditions of supervision. The matter is fully briefed. (Doc. Nos. 10, 15.) For the reasons set forth below, the Court **GRANTS** Petitioner's motion for order on written submissions, and **GRANTS IN PART AND DENIES IN PART** the Petition.

1

## I.  BACKGROUND

Petitioner alleges he is a native and citizen of Honduras. (Doc. No. 1 at 2.) He states he grew up alone "on the streets of Tegucigalpa, Honduras," does not know of any family members in Honduras, and "does not have any Honduran identity documents." (Doc. No. 15 at 8.) When Petitioner was 9 or 10 years old, he allegedly left Honduras alone on a truck to Mexico. (*Id.*) Petitioner has lived in Mexico all his life since that time, except when he has attempted to enter the United States. (*Id.*)

Petitioner was ordered deported from the United States for the first time on February 15, 2000. (*Id.*) Petitioner has been deported/removed to Honduras at least five times: in 2000, 2001, 2007, 2009, and 2011. (Doc. No. 10 at 2; Doc. No. 10-1 at 42, 50, 57, 64, 72, 80.) He has been convicted of illegal entry or re-entry into the United States four times: in 2001, 2009, 2010, and 2018. (Doc. No. 10-1 at 80.) Petitioner states each time he is "removed to Honduras, he travels immediately to Mexico, leaving if he can on the same day he arrives." (Doc. No. 15 at 8.) Throughout Petitioner's interactions with the United States immigration system, Petitioner has provided various names, birth dates, and various names of his mother and father. (Doc. No. 10 at 3.)

On November 24, 2018, Petitioner re-entered the United States, and was arrested on criminal immigration charges. (Doc. No. 1 at 3.) Eventually, judgment was entered in the criminal immigration case, Petitioner was ordered removed from the United States, and Petitioner was taken into ICE custody. (*Id.*) Since Petitioner has been in immigration custody, Respondents have been unable to obtain travel documents to effectuate Petitioner's removal. (*Id.*) Petitioner has repeatedly requested travel documents from the Honduran consulate, but the consulate has refused to issue the documents or otherwise allow Petitioner to be deported to Honduras. (*Id.*) The Honduran consulate's refusal is based on the inability to verify Petitioner's identity. (*Id.*) According to Respondents, "the matter is receiving special handling by the Honduran embassy in Washington, D.C., and that the Honduran government's Ministry of Foreign Affairs is conducting an investigation for final analysis and resolution of the case." (*Id.*) Petitioner has not been removed and has

remained in immigration custody since approximately March 2019. (Doc. No. 2 at 6.)

## II. PROCEDURAL HISTORY

On October 8, 2019, Petitioner filed a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2241, seeking an order directing Respondents to release him from custody under the conditions of supervision as set forth in 8 U.S.C. § 1231(a)(3). (Doc. No. 1.) Respondents filed their Return in opposition to the Petition on March 11, 2020. (Doc. No. 10.) Petitioner filed a Traverse on March 25, 2020. (Doc. No. 15.) On May 26, 2020, Petitioner also filed a motion for an order on written submissions or to set an evidentiary hearing. (Doc. No. 16.) This order follows.

## III. JURISDICTION

Pursuant to 28 U.S.C. § 2241, alien detainees can properly challenge the extent of the Attorney General's authority to detain a removable alien under the statutes authorizing detention. *See Zadvydas v. Davis*, 533 U.S. 678, 687–89 (2001*); see also Demore v. Kim*, 538 U.S. 510, 516–17 (2003). Although the REAL ID Act of 2005 divested district court jurisdiction over habeas petitions challenging orders of removal, it does not divest the district court of jurisdiction over challenges to detention. *See Martinez v. Napolitano*, 704 F.3d 620, 622 (9th Cir. 2012) (citation omitted). However, the scope of the federal courts' review is limited to constitutional claims and questions of law. *See Singh v. Holder*, 638 F.3d 1196, 1202 (9th Cir. 2011). Here, Petitioner challenges his continued detention and not the validity of a final order of removal. Therefore, this Court has jurisdiction under 28 U.S.C. § 2241 to consider his Petition.

## IV. DISCUSSION

### A.   The Parties' Contentions

At the center of this dispute, Petitioner argues he should be released under conditions of supervision because he has been detained for over a year, and his detention exceeds the six-month reasonable detention period to effectuate the removal of an alien announced in *Zadvydas v. Davis*, 533 U.S. 678 (2001). (Doc. No. 1 at 5.) In opposition, Respondents maintain that because Petitioner has failed to cooperate in the efforts to remove him, his

3

detention is justified as an exception. In reply, Petitioner maintains that this exception should not apply because he has cooperated in his repatriation process, and there are suspect circumstances surrounding Respondents' argument that Petitioner has failed to cooperate. (Doc. No. 15 at 15.)

### B.     Statutory Framework

Ordinarily, the Attorney General must remove an alien in custody within ninety days from the issuance of a final removal order. *See* 8 U.S.C. § 1231(a)(1)(A)-(B). Two "exceptions" are relevant to this case. First, § 1231(a)(6) provides for an extension to the ninety-day rule: "[a]n alien ordered removed . . . who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period . . . . " 8 U.S.C. § 1231(a)(6). However, in *Zadvydas*, the United States Supreme Court clarified this extension by establishing a three-month discretionary detention period beyond the initial ninety days, during which detention remains presumptively valid. *See Zadvydas*, 533 U.S. at 701. Thus, the post-removal-period is presumptively limited to six months in order to prevent the Government from detaining an alien indefinitely. *Id.* "This . . . does not mean that every alien not removed must be released after six months" as the presumptive six-month period is rebuttable. *Id.* Following the six-month period, "once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing." *Id.* Also, detention beyond the six-month period is "prolonged" and "requires that adequate procedural safeguards be in place to protect against the erroneous deprivation of liberty." *Diouf v. Napolitano*, 634 F.3d 1081, 1091 (9th Cir. 2011). An alien subjected to prolonged detention is "entitled to a bond hearing before an immigration judge ('IJ') and is entitled to be released from detention unless the government establishes that the alien poses a risk of flight or a danger to the community." *Id.* at 1092.

A second "exception" to the ninety-day removal period is provided in 8 U.S.C. § 1231(a)(1)(C), which states:

4

> The removal period shall be extended beyond a period of 90 days and the alien may remain in detention during such extended period if the alien fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure or conspires or acts to prevent the alien's removal subject to an order of removal.

8 U.S.C. § 1231(a)(1)(C).

The Ninth Circuit has held that the same six-month time limitation does not apply to § 1231(a)(1)(C) because the provision does not present the same constitutional concerns as raised by § 1231(a)(6)—the provision at issue in *Zadvydas*. The same risk of indefinite detention does not exist when an alien is the cause of his own detention. Petitioners that cause obstructions to the repatriation process have the "keys [to their freedom] in [their] pocket" and could likely effectuate their removal by providing the information requested. *Pelich v. I.N.S.*, 329 F.3d 1057, 1060 (9th Cir. 2003)

### C. Analysis

It is undisputed that Petitioner has been detained by Respondents for over a year. Thus, with the above statutory framework in mind, the Court will address Respondents' contention that § 1231(a)(1)(C) applies to extend the permissible detention period. The Court will also address Petitioner's contention that his detention beyond the six-month period is improper.

#### 1. Whether § 1231(a)(1)(C) Applies

Respondents argue this case falls within the § 1231(a)(1)(C) exception, and is controlled by *Pelich v. INS*, 329 F.3d 1057 (9th Cir. 2003), because Petitioner's long history of providing false biographical information to the U.S. Border Patrol and ICE has complicated current efforts to effectuate his repatriation. (Doc. No. 10 at 3–4.) Respondents argue they have been diligently attempting to obtain travel documents to repatriate Petitioner, but the Honduran government has been unable to verify that he is a Honduran citizen. (*Id.* at 1.) Respondents explain the "Honduran government has stricter guidelines now, and [Petitioner's] extensive history of inconsistent biographical information has complicated efforts to verify his identity. ICE is accordingly issuing him a March 11, 2020

decision letter, finding that he has failed to cooperate with efforts to repatriate him." (*Id.* at 3.) In reply, Petitioner argues that contrary to Respondents' representations, Petitioner has been fully cooperating with the Government, and there is no significant likelihood of removal in the reasonably foreseeable future. (Doc. No. 15 at 27.)

In *Pelich*, petitioner, a native of Poland, legally entered the United States as a refugee, but was later convicted of felony embezzlement and detained by the Immigration and Naturalization Service ("INS") upon his release from prison. *Pelich*, 329 F.3d at 1058. When the INS attempted to effect Pelich's removal to Poland, the Polish consulate supplied a passport application to enable the consulate to determine whether Pelich was eligible for Polish travel documents. *Id.* Pelich repeatedly refused to complete the Polish passport application because he claimed his father was German and therefore he was not a Polish citizen. *Id.* The Ninth Circuit held that the exception to the ninety-day detention period set forth in § 1231(a)(1)(C) applied, and Pelich could not "squeeze his case into the confines of *Zadvydas*." *Id.* at 1059. The court noted, "[u]nlike the aliens in *Zadvydas*, Pelich has the 'keys [to his freedom] in his pocket' and could likely effectuate his removal by providing the information requested by the INS." *Id.* at 1060 (citation omitted). Thus, the Ninth Circuit concluded that a petitioner who impedes removal efforts falls into the § 1231(a)(1)(C) exception, and "has not met his burden of showing that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.*

There are several reasons why this case is different from *Pelich*. First, whereas the petitioner in *Pelich* actively refused to comply with the procedures to finalize his travel documents, the same cannot be said here.[1] Petitioner has made a good faith effort to

---

[1] Respondents maintain that they have issued a "Notice of Failure to Comply" ("the Notice") to Petitioner, furthering demonstrating that § 1231(a)(1)(C) is applicable. However, suspect circumstances surround Respondents' issuance of the Notice. (Doc. No. 15 at 17.) Most notably, the evidence does not show that noncooperation was the main reason provided to Petitioner for his continued detention. Instead, the record reflects that Respondents did not level these accusations of noncooperation against Petitioner until one day after Respondents' Return was due in this Court. As late as February 21, 2020, ICE's internal documentation explicitly stated that Petitioner's matter was not a failure to cooperate case, and the

6

effectuate his removal, and his declaration filed in support of his Petition demonstrates that he has been actively complying with repatriation process. These efforts include providing ICE biographical information; complying with ICE's efforts to take photographs and fingerprints; participating in seven meetings with the Honduran consulate; filing written requests to be moved closer to the Honduran embassy in Washington, D.C. and to have in-person interviews with the Honduran consulate; and calling the ICE office in Washington, D.C. dozens of times asking to be removed. (Doc. No. 15 at 9–10.)

Second, the record is insufficient to establish a causal link between Petitioner's past noncompliance and the Honduran government's current refusal to accept Petitioner. Based on the documentation submitted by Respondents, Petitioner's identity cannot be verified by the Honduran government because "they have a new process how [sic] to verify citizenship" and there is no information about Petitioner's identity, family, or residence in Honduras. (Doc. No. 10-1 at 83.) Contrary to Respondents' assertions, the evidence does not suggest that the refusal to repatriate Petitioner on the part of the Honduran government was a result of Petitioner's alleged noncompliance in the past.

In any event, Respondents have not demonstrated non-compliance within the ninety-day removal period. In *Diouf v. Mukasey*, the Ninth Circuit addressed how § 1231(a)(1)(C) applies when a detainee fails to comply for some period of time but later starts complying with efforts to remove him. *See Mukasey*, 542 F.3d at 1231. The Ninth Circuit held that in such circumstances, the reasonable removal period ends ninety days after "the latest evidence of [the detainee's] obstruction." *Id.* The *Mukasey* court also clarified that the Government must produce "positive evidence" of noncompliance during this time. Here, Respondents do not produce any positive evidence of Petitioner's noncompliance within

---

inability to repatriate Petitioner was due to the Honduran government's refusal to issue travel documents to Petitioner. (Doc. No. 10-1 at 96.) Because of these suspect circumstances suggesting an ad hoc justification for the purpose of litigation, the Court accords the Notice little weight. *See Seretse-Khama v. Ashcroft*, 215 F. Supp. 2d 37, 53 (D.D.C. 2002) (declining to apply the exception in § 1231(a)(1)(C), reasoning "[i]t is only after petitioner sought relief in federal court that the INS developed an additional reason for refusal to issue travel documents based on his statement that he did not want to return. . . .").

7

the last ninety days. Instead, the Return points to statements Petitioner made between 1999 and 2018, the latest of which dates to November 24, 2018. (Doc. No. 15 at 22.)

Accordingly, the foregoing leads to the Court's conclusion that § 1231(a)(1)(C) does not apply to extend the removal period. There is ample evidence establishing Petitioner's compliance with efforts to remove him.

### 2.      Whether Petitioner's Detention Under § 1231(a)(6) Is Proper

Finding that the above exception does not apply, the Court next discusses whether Petitioner is properly being held in custody pending the approval of his travel documents. Petitioner claims he is being held in detention pursuant to § 1231(a)(6). (Doc. No. 1 at 5.) As noted above, the Attorney General must remove an alien in custody within ninety days from the issuance of a final removal order. 8 U.S.C. §§ 1231(a), 1231(a)(2). If the noncitizen has not been removed during this period, § 1231(a)(6) authorizes continued detention at the discretion of the Attorney General. 8 U.S.C. § 1231(a)(6). However, once detention becomes prolonged and the detainee is not provided with adequate bond hearings, serious due process concerns arise. *See Diouf v. Napalitano*, 634 F.3d 1081, 1091 (9th Cir. 2011). The Ninth Circuit has imposed a bright-line standard, defining "prolonged detention" as that which exceeds six-months. *Diouf*, 634 F.3d at 1092 n.13 ("As a general matter, detention is prolonged when it has lasted six months and is expected to continue more than minimally beyond six months."). Furthermore, after this six-month period, an alien is eligible for conditional release upon demonstrating "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." *Zadvydas*, 533 U.S. at 701. The burden then shifts to the Government to respond with sufficient evidence to rebut that showing. *Id.* The six-month presumption "does not mean that every alien not removed must be released after six months. To the contrary, an alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.*

Here, Petitioner has been detained in Respondents' custody well beyond the presumptively reasonable 6-month period as Petitioner's removal period began in March

8

2019 when he rescinded his request for an asylum interview. (Doc. No. 15 at 8.) Because Petitioner's detention exceeds the six-month period, Petitioner may demonstrate he is eligible for conditional release if "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." *Diouf*, 634 F.3d at 1092.

Petitioner argues there is "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future" because "Honduras has refused to issue travel documents" to repatriate Petitioner. (Doc. No. 15 at 28.) Petitioner explains he has had seven phone calls with the Honduran consulate in order to cooperate in the removal process, the most recent of which was on March 11, 2020. (Doc. No. 15 at 8.) During each call, he and ICE have urged the consulate to issue travel documents so he can be removed. (*Id.*) Each time, however, the Honduran consulate refuses to issue the travel documents because "Mr. Lopez does not appear in the Honduran national registry" and "Mr. Lopez has no family, friends, or contacts in Honduras." (*Id.* at 9.) In the past, Petitioner has been able to be removed to Honduras because the Honduran government would "issue travel documents by asking the person a few questions to figure out if the person was Honduran . . . But now, Honduras requires more proof of Honduran citizenship before it will issue travel documents." (Doc. No. 15-1 at ¶ 15.)  Lastly, the Honduran Vice Consul has also informed Petitioner that there is no time limit on any residual investigatory efforts to establish his citizenship. (*Id.* at ¶ 21.)

Based on Petitioner's showing of this bureaucratic stalemate, there is "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." *Diouf*, 634 F.3d at 1092. Indeed, courts have noted that it is appropriate to grant habeas relief "where there [is] no definitive answer from the target county after several months as to whether it would issue travel papers for a detainee." *Nasr v. Larocca*, No. CV 16-1673-VBF (E), 2016 WL 3710200, at *3 (C.D. Cal. June 1, 2016) (citing *Nma v. Ridge*, 286 F. Supp. 2d 469, 475 (E.D. Pa. 2003)).

With Petitioner meeting his burden in showing that there is "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future," the

burden now shifts to Respondents to "respond with evidence sufficient to rebut that showing." *Zadvydas*, 533 U.S. at 701. In rebuttal, Respondents maintain, "ICE has been in continuous contact with [Petitioner] and the Honduran consulate in an effort to ascertain [Petitioner's] true identity to obtain a travel document for his repatriation there. The undersigned was informed today that the matter is receiving special handling by the Honduran embassy in Washington, D.C., and that the Honduran government's Ministry of Foreign Affairs is conducting an investigation for final analysis and resolution of the case." (Doc. No. 10 at 3 (citations omitted).) Further, Respondents state, "ICE has obtained travel documents from the Honduran government before, so it remains optimistic that it will be able to do so again, especially given the special handling by the Honduran embassy and the Honduran Ministry of Foreign Affairs." (*Id.* at 4 (citations omitted).)

However, the Court remains skeptical that Petitioner's removal is imminent, given that Petitioner's detention has exceeded the presumptively reasonable period by nearly ten months, and the Honduran government has repeatedly denied Petitioner travel documents. While Petitioner's case is currently given special handling, "[g]eneral indications that U.S. agencies have been in discussions with [target country] regarding repatriation efforts do not indicate that those discussions will result in the timely removal of Petitioner, as it is unclear whether those efforts will be successful." *Zhao v. Kelly*, No. CV 17-777-BRO (KES), 2017 WL 1591818, at *4 (C.D. Cal. Apr. 27, 2017).

**D.  Whether Petitioner Should Be Immediately Released**

Because of these circumstances, there are "serious due process concerns" given Petitioner's prolonged detention with no reasonably foreseeable chance of removal to Honduras. *See Diouf*, 634 F.3d at 1091. Under Ninth Circuit authority, individuals held under 8 U.S.C. § 1231 are entitled to a bond hearing after six months of detention, where the government bears the burden of justifying their continued imprisonment. *See Diouf*, 634 F.3d at 1082. Although the record reflects that ICE has conducted at least two custody reviews and decided to continue detaining Petitioner due to high flight risk concerns, (Doc. No. 10-1 at 78–94, 94), there is no indication that Petitioner has received a bond hearing

before a neutral immigration judge ("IJ") to address the due process concerns related to his prolonged detention. The Court notes that there are certainly concerns regarding Petitioner's high flight risk given his lengthy history of illegal entry and re-entry, in addition to his record of providing false biographical information to the Government. Thus, while Petitioner requests his release outright, the Court joins other courts in this circuit that have favored "ordering a bond hearing before an IJ over ordering outright release." *Sied v. Nielsen*, No. 17-CV-06785-LB, 2018 WL 1876907, at *4 (N.D. Cal. Apr. 19, 2018); *Cortez v. Sessions*, No. 18-cv-01014-DMR, 2018 WL 1510187, at *10 (N.D. Cal. Mar. 27, 2018) (ordering bond hearing but not ordering immediate release); *Bahena v. Aitken*, No. 1:17-cv-00145-JLT (HC), 2017 WL 2797802, at *1 (E.D. Cal. June 27, 2017) (report and recommendation) (same). As articulated by the Court in *Mansoor v. Figueroa*, No. 3:17-cv-06195-GPC (NLS), 2018 WL 840253 (S.D. Cal. Feb. 13, 2018), "IJs are a specialized and experienced group within the Department of Justice already entrusted to make determinations about the government's legitimate interest in the further deprivation of a noncitizen's liberty. The power to order a bail hearing before an IJ is the type of practice and workable remedy within the district court's broad equitable powers." Therefore, the Court declines to order Petitioner's immediate release, and instead orders that Petitioner receive an individualized bond hearing before an IJ to release him on bond *unless* he is deemed a flight risk or a danger to the community.

## V.   CONCLUSION

For the foregoing reasons, the Court **GRANTS** Petitioner's motion for an order on written submissions. (Doc. No. 16.) Additionally, the Petition is **GRANTED IN PART AND DENIED IN PART**. The Court **DENIES** Petitioner's request for immediate release. However, because of the due process concerns, the Court **ORDERS** that Petitioner receive an individualized bond hearing **within 21 days** before an IJ to release him on bond unless he is deemed a flight risk or a danger to the community. That hearing must comply with the requirements set forth in *Diouf*, including the requirement that the government bear the burden of proving that Petitioner is a flight risk or a danger to the community to justify

denial of bond.

**IT IS SO ORDERED.**

Dated: June 9, 2020

Hon. Anthony J. Battaglia
United States District Judge